No. 14-3286

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

**FEDERAL TRADE COMMISSION,**
*Plaintiff - Appellee,*

v.

**ERIC JOHNSON,**
*Receiver – Appellee,*

**BF LABS, INC.; DARLA DRAKE;**
**NASSER GHOSEIRI; SONNY VLEISIDES,**
*Defendants – Appellees,*

---

**KYLE ALEXANDER; DYLAN SYMINGTON,**
*Movants – Appellants.*

---

Appeal from the U.S. District Court, Western District of Missouri
The Honorable Brian C. Wimes, District Judge

---

## MOVANTS – APPELLANTS' BRIEF

---

**WOOD LAW FIRM, LLC**
Noah K. Wood, MO #51249
Ari N. Rodopoulos, MO #58777
1100 Main Street, Suite 1800
Kansas City, Missouri 64105
Tel: (816) 256-3582
Fax: (816) 337-4243
Attorneys for Movants – Appellants

## SUMMARY OF THE CASE

In April 2014, Movants – Appellants Kyle Alexander and Dylan Symington filed a class action complaint against BF Labs, Inc. ("BFL") in the District of Kansas alleging BFL violated the Kansas Consumer Protection Act, was unjustly enriched, made negligent misrepresentations, and committed conversion of personal property. The class action seeks compensatory and punitive damages, a constructive trust to recover property, costs of suit, and attorney's fees.

In September 2014, Appellee Federal Trade Commission ("FTC") filed a complaint against BFL and other individuals in the Western District of Missouri seeking temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief. In the FTC action, U.S. District Judge Brian C. Wimes entered an *ex parte* temporary restraining order enjoining BFL and other individuals, freezing BFL's assets, appointing a receiver, and staying all actions against BFL, including the class action in the District of Kansas.

Kyle Alexander and Dylan Symington moved on an emergency basis to intervene in the FTC action under Rule 24, which was denied by Judge Wimes. Kyle Alexander and Dylan Symington now seek appellate review of Judge Wimes' order denying their motion to intervene in the FTC action. Kyle Alexander and Dylan Symington request fifteen minutes of oral argument.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE ........................................................................ i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ..................................................................... v

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................... 2

I.     WHETHER APPELLANTS, AS REPRESENTATIVES OF A PUTATIVE CLASS, ARE ENTITLED TO INTERVENE PURSUANT TO RULE 24 IN AN ACTION THAT SEEKS TO (1) MODIFY AND/OR TERMINATE APPELLANTS' CONTRACTUAL RIGHTS, (2) DISPOSE OF PERSONAL PROPERTY PURCHASED AND PAID FOR BY APPELLANTS, AND (3) DISPOSE OF PERSONAL PROPERTY APPELLANTS SEEK TO RECOVER IN A PRIOR PENDING CLASS ACTION LAWSUIT, IN CIRCUMSTANCES WHERE THE ONLY PARTY EVEN PURPORTING TO REPRESENT APPELLANTS' INTERESTS HAS AGREED WITH THE WRONGDOER ON THE RECORD THAT APPELLANTS HAVE NO CONTRACTUAL OR PROPERTY INTERESTS AT STAKE? ....................................................................... 2

Appellate Case: 14-3286    Page: 3    Date Filed: 11/25/2014  Entry ID: 4219473

STATEMENT OF THE CASE ................................................................ 3

SUMMARY OF THE ARGUMENT ................................................... 17

ARGUMENT ...................................................................................... 25

I.      STANDARD OF REVIEW ...................................................... 25

II.     ARTICLE III STANDING IS NOT GENUINELY DISPUTED ................ 25

        A.     Consumers have alleged several actual or imminent injuries ............ 26

        B.     Consumers' alleged injuries are directly traceable to the FTC action ........................................................................ 29

        C.     Consumers' alleged injuries can be redressed ................................. 29

III.    CONSUMERS ARE ENTITLED TO INTERVENE AS OF RIGHT UNDER RULE 24 ........................................................ 30

        A.     Consumers' motion to intervene was timely ..................................... 30

        B.     Consumers claim an interest in the exact property and exact transactions that are the subject of the FTC action ............................. 31

        C.     Disposition of the FTC action might impair and impede Consumers' ability to protect their interests and the interests of the putative class ...................................................... 31

        D.     Consumers' interests are not adequately represented by the FTC or BFL .......................................................................... 35

CONCLUSION .................................................................................. 40

Appellate Case: 14-3286     Page: 4     Date Filed: 11/25/2014 Entry ID: 4219473

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ..................................... 41

Appellate Case: 14-3286    Page: 5    Date Filed: 11/25/2014 Entry ID: 4219473

# TABLE OF AUTHORITIES

**CASES**

*Chiglo v. City of Preston*,

    104 F.3d 185 (8th Cir. 1997) ........................................................................ 36

*Conservation Law Found. of New England, Inc., v. Mosbacher*,

    966 F.2d 39 (1st Cir. 1992) ......................................................................... 37

*Corby Recreation, Inc. v. General Elec. Co.*,

    581 F.2d 175 (8th Cir. 1978) ...................................................................... 35

*Curry v. Regents of Univ. of Minnesota*,

    167 F.3d 420 (8th Cir. 1999) ........................................... 2, 21, 25, 30, 36

*Kansas Pub. Employees Retirement Sys. v. Reimer & Koger Assoc., Inc.*,

    60 F.3d 1304 (8th Cir. 1995) ...................................................................... 31

*Lehigh, Inc. v. Stevens*,

    468 P.2d 177 (Kan. 1970) ............................................................. 20, 26, 31

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) .................................... 24

*Mille Lacs Band of Chippewa Indians v. Minnesota*,

    989 F.2d 994 (8th Cir. 1993) ........................................................ 2, 27, 35, 36

*National Parks Conservation Ass'n v. U.S. E.P.A.*,

    759 F.3d 969, 973-974  (8th Cir. 2014)........................... 2, 21, 24, 25, 28, 37

Appellate Case: 14-3286     Page: 6     Date Filed: 11/25/2014 Entry ID: 4219473

*SEC v. Flight Transp. Corp.*,

    699 F.2d 943 (8th Cir. 1983) ........................................................ 34

*South Dakota ex rel Barnett v. U.S. Dept. of Interior*,

    317 F.3d 783 (8th Cir. 2003) ......................................................... 1

*Trbovich v. United Mine Workers*,

    404 U.S. 528 (U.S. 1972) ......................................................... 2, 34

*Turn Key Gaming, Inc. v. Miler & Schroeder Investments, Corp.*,

    164 F.3d 1080 (8th Cir. 1999) ...................................................... 34

*U.S. v. Metro. St. Louis Sewer Dist.*,

    569 F.3d 829 (8th Cir. 2009) ....................................................... 24

*U.S. v. White Plume*,

    447 F.3d 1067 (8th Cir. 2006) ...................................................... 27

*U.S. v. Union Electric Co.*,

    64 F.3d 1152 (8th Cir. 1995) ....................................................... 29

## OTHER AUTHORITIES

15 U.S.C. § 53 ................................................................................ 32

## RULES

Fed. R. Civ. P. 11 ......................................................................... 38

Fed. R. Civ. P. 24 ........................................................... 2, 21, 29, 30

Appellate Case: 14-3286    Page: 7    Date Filed: 11/25/2014 Entry ID: 4219473

# JURISDICTIONAL STATEMENT

On October 3, 2014, U.S. District Judge Brian C. Wimes denied Appellants' motion to intervene in the FTC action, Case No. 14-CV-00815. (Appendix, 323-326). That same day, Appellants filed a notice of appeal seeking review of the district court's denial of Appellants' motion to intervene. (*Id*. at 327-328).

This Court has jurisdiction to review an appeal of an order denying intervention. *See South Dakota ex rel Barnett v. U.S. Dept. of Interior*, 317 F.3d 783, 785 (8th Cir. 2003) ("The denial of a motion to intervene of right is immediately appealable as a final judgment.").

Appellate Case: 14-3286    Page: 8    Date Filed: 11/25/2014 Entry ID: 4219473

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.    WHETHER APPELLANTS, AS REPRESENTATIVES OF A PUTATIVE CLASS, ARE ENTITLED TO INTERVENE PURSUANT TO RULE 24 IN AN ACTION THAT SEEKS TO (1) MODIFY AND/OR TERMINATE APPELLANTS' CONTRACTUAL RIGHTS, (2) DISPOSE OF PERSONAL PROPERTY PURCHASED AND PAID FOR BY APPELLANTS, AND (3) DISPOSE OF PERSONAL PROPERTY APPELLANTS SEEK TO RECOVER IN A PRIOR PENDING CLASS ACTION LAWSUIT, IN CIRCUMSTANCES WHERE THE ONLY PARTY EVEN PURPORTING TO REPRESENT APPELLANTS' INTERESTS HAS AGREED WITH THE WRONGDOER ON THE RECORD THAT APPELLANTS HAVE NO CONTRACTUAL OR PROPERTY INTERESTS AT STAKE?

- *Trbovich v. United Mine Workers*, 404 U.S. 528 (U.S. 1972);

- *National Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969 (8th Cir. 2014);

- *Curry v. Regents of Univ. of Minnesota*, 167 F.3d 420 (8th Cir. 1999);

- *Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994 (8th Cir. 1993);

- Fed. R. Civ. P. 24

2

## STATEMENT OF THE CASE

This appeal involves a new digital technology called "bitcoin." Bitcoin is a peer-to-peer payment system and digital currency created in 2009. (Appendix, 122). Unlike traditional currency, bitcoins are not issued by a government or central banking authority. (*Id*.). Bitcoin is considered a "cryptocurrency" because cryptography is used to control the creation and transfer of the currency, creating a distributed, decentralized, and secure medium of exchange. (*Id*. at 122-123). Bitcoins are regularly used to pay debts, purchase goods and services, and are exchanged for other currencies such as the U.S. dollar, U.K. pound sterling, or euro. (*Id*. at 123). For example on March 19, 2014, one bitcoin could be exchanged for an average of $613.12. (*Id*.). The Internal Revenue Service has declared that bitcoins are not actual currency, but rather, are taxable as valued property. (*Id*. at 33).

Bitcoins are created by "mining"—a process where "miners" receive transaction fees and newly minted bitcoins in return for verifying and recording payments into a public ledger. (Appendix, 123). By design, mining is a computationally intensive process that becomes more difficult over time. (*Id*.). For example, a miner solving the computational puzzle could earn a reward of 50 bitcoins in 2008, but that reward halved in 2012 to 25 bitcoins, and it will drop to

3

12.5 bitcoins in 2016. (*Id*. at 34). The total number of bitcoins in existence will never exceed 21,000,000 and all bitcoins are expected to be mined by 2140. (*Id*.).

As the difficulty of Bitcoin mining has increased over time, the computer hardware required to profitably mine has advanced from general purpose CPUs (found in common desktop computers), high-end GPUs (often found in gaming computers), FPGAs (field-programmable gate arrays), and ultimately to ASICs (application-specific integrated circuits) purpose built for performing the calculations necessary for Bitcoin mining. (Appendix, 123). Given the finite number of bitcoins being produced, the increasing number of miners and complexity of the computational puzzles, and the introduction of faster and more specialized equipment, obtaining the most cutting-edge technology in a timely manner is paramount for anyone to successfully make a profit by mining for bitcoins. (*Id*. at 34).

BFL advertises itself to the public as a manufacturer of specialized computer equipment and processors for the task of mining bitcoins. (Appendix, 122). Using the name "Butterfly Labs," BFL advertised for sale via the Internet a variety of ASIC based Bitcoin mining hardware, stating, "Butterfly Labs manufactures a line of high speed encryption processors for use in bitcoin mining, research, telecommunication and security applications." (*Id*. at 124). BFL required consumers to pre-pay by PayPal, with bitcoins, or by bank wire transfer the entire

4

amount of an order at the time the order was placed. (*Id*.). The Bitcoin mining products advertised by BFL ranged in price from $75 to over $20,000. (*Id*.).

BFL represented that inventory of its Bitcoin mining products "was available." (Appendix, 24). BFL represented its Bitcoin mining products were "in production" and "real." (*Id*.). BFL represented its Bitcoin mining products were "expected to begin shipping soon," "shipping [had already] begun," or products would be "shipping by the end of the week." (*Id*.). BFL represented that customers would most likely receive their equipment within "two months" after ordering, or such equipment "would be shipped in two months," or sooner. (*Id*.). BFL represented customers could receive a refund simply by asking for one, that "it's not a problem" for a customer to receive a refund, and BFL could refund all prepayments "without a problem." (*Id*. at 125). BFL represented orders would be "shipped according to placement in the order queue" and for particular products the "first batch of chips" would be "more than enough for all pre-orders." (*Id*.). BFL represented that it did not itself mine bitcoins. (*Id*.).

In or about 2012, BFL purchased a business known as "Eclipse Mining Consortium," which operates as a Bitcoin mining pool, an organization that permits the combination of Bitcoin mining efforts to offer participants faster, yet smaller, bitcoin distributions than would be achievable if the participants conducted mining operations on their own. (Appendix, 125). Instead of shipping

5

completed Bitcoin mining hardware to customers after customers have already paid for the equipment, BFL utilized completed Bitcoin mining hardware to earn mining income for itself under the guise of "testing" such hardware. (*Id*.). This "testing" served to enrich BFL at the detriment of its customers by both denying customers the use and benefit of equipment they have already paid for, as well as increasing the overall mining difficulty required to generate future bitcoins. (*Id*. at 125-126).

In June 2013, Movant – Appellant Kyle Alexander ordered a Bitcoin mining machine from BFL. (Appendix, 126). Kyle Alexander paid $308.00 to BFL via PayPal for this equipment. (*Id*.). At the time Kyle Alexander ordered and paid for mining equipment, BFL represented to Kyle Alexander and other potential customers that its inventory "was available," "in production," available for "shipping soon," and/or that "shipping [had already] begun," and that customers would most likely receive their equipment within "two months" after ordering. (*Id*. at 126-127). In July 2013, Kyle Alexander contacted BFL to inquire about his order and was informed by BFL that "shipping had begun." (*Id*. at 127). Over the next several months, Kyle Alexander continued to inquire about his order and was repeatedly informed by BFL that "shipping had begun." (*Id*.). In March 2014, Kyle Alexander again inquired about his order and BFL advised him of the "good news" that his order had been changed to BFL's "Mining by the GH" product,

Appellate Case: 14-3286    Page: 13    Date Filed: 11/25/2014 Entry ID: 4219473

which is described on BFL's website as a "product which is not yet live," which BFL "expect[s] to launch in April, 2014." (*Id*.). Kyle Alexander never changed or modified his order and never gave BFL permission to use the equipment he ordered to mine bitcoins for itself or for anyone else. (*Id*.). To date, Kyle Alexander has not received any mining equipment from BFL. (*Id*.).

In April 2013, Movant – Appellant Dylan Symington ordered a Bitcoin mining machine from BFL. (Appendix, 127). Dylan Symington paid $1,333.00 to BFL via PayPal for this equipment. (*Id*. at 127-128). At the time Dylan Symington ordered and paid for mining equipment, BFL represented to Dylan Symington and other potential customers that its inventory "was available," "in production," available for "shipping soon," and/or that "shipping [had already] begun," and that customers would most likely receive their equipment within "two months" after ordering. (*Id*. at 128). In September 2013, Dylan Symington contacted BFL to inquire about his order and why he had not yet received any mining equipment from BFL. (*Id*.). Nearly seven months after receiving payment, BFL shipped mining equipment to Dylan Symington. (*Id*.). Dylan Symington never gave BFL permission to use the equipment he ordered to mine bitcoins for itself or for anyone else. (*Id*.).

On April 4, 2014, Movants – Appellants Kyle Alexander and Dylan Symington ("Consumers") filed a class action complaint in the District of Kansas

Appellate Case: 14-3286    Page: 14    Date Filed: 11/25/2014 Entry ID: 4219473

alleging BFL violated the Kansas Consumer Protection Act, was unjustly enriched, made negligent misrepresentations, and committed conversion of personal property. (*Id.* at 121-141). Consumers' class action challenges BFL's "deceptive and unconscionable business practices, including: collecting pre-payments for non-existent Bitcoin mining equipment, failing to ship Bitcoin mining equipment orders for which consumers have pre-paid, misrepresenting the date such equipment is to ship to customers, and profiting from Bitcoin mining for [BFL's] own benefit using customers' equipment without permission or authorization from customers." (*Id.* at 121). Consumers seek compensatory and punitive damages, a constructive trust to recover property, costs of suit, and attorney's fees. (*Id.* at 134).

Between April and September 2014, Consumers engaged in significant discovery and had made significant progress negotiating a class-wide settlement on behalf of the putative class. (Appendix, 107). Consumers and BFL engaged in settlement negotiations, which include modeled complex scenarios that involve cash and non-cash benefits (such as providing bitcoins, mining hardware, and hashing to class members) and agreed to mediate on November 5, 2014. (*Id.* at 107, 115). Trial is scheduled for January 4, 2016. (*Id.* at 107).

On September 15, 2014, the FTC filed a complaint in the Western District of Missouri against BFL and other individuals seeking temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the

8

refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief. (Appendix, 30). The FTC also filed a motion to seal the case file and an *ex parte* motion for a temporary and permanent injunction and other equitable relief, including an asset freeze and the appointment of a receiver. (*Id.* at 22-23).

On September 18, 2014, the FTC obtained from U.S. District Judge Brian C. Wimes an *ex parte* temporary restraining order ("TRO"), which, among other things, temporarily enjoins BFL and other individuals, freezes assets, and appoints a receiver. (Appendix, 50-82). The TRO also states "[e]xcept by leave of this Court, . . . Defendants and all other persons and entities . . . are stayed from taking any action to establish or enforce any claim, right, or interest for, against, on behalf of, in, or in the name of, the Receivership Defendant[.]" (*Id.* at 75).

Pursuant to the *ex parte* order obtained by the FTC, the Temporary Receiver appointed by Judge Wimes in the Western District of Missouri took possession of all or nearly all of BFL's property and assets located in the District of Kansas. (Appendix, 113-114). This includes hard drive images and discovery material prepared for the class action that was taken into custody on Friday, September 19, 2014, and which was due to be turned over to Consumers the following Monday, September 22, 2014. (*Id.* at 113). On September 23, 2014, the FTC issued a media statement titled, "At FTC's Request, Court Halts Bogus Bitcoin Mining Operation." (*Id.* at 161).

9

Consumers' counsel has been the primary point of contact for over a thousand individuals with claims against BFL, including telephone, e-mail, and postal mail contact on a daily basis. (Appendix, 116). Prior to the filing of the FTC action, less than 400 individuals had reached out to the FTC and many were told the FTC offered them no avenue of redress, the FTC was not willing to get involved, and/or they needed to file a private lawsuit or complain to their local district attorney. (*Id*.).

Since the FTC action was filed, a significant number of putative class members have contacted Consumers' counsel expressing fear the FTC action will mean they will never receive the equipment they ordered from BFL, any money damages from the class action, or their day in court. (Appendix, 116). A number of individuals have protested the actions of the FTC as putting them in a worse position than before the FTC action was instituted because BFL was shipping mining equipment, although late, and had started providing refunds to class members (who wanted refunds) in response to the class action. (*Id*. at 115-116, 232-241). For example, one individual wrote:

> FTC's involvement is only hurting legit consumers! FTC
> get out of the way and let us start receiving the products
> we've ordered!!! You're only further hurting the
> consumer now!

10

(Appendix, 237).  Another individual wrote:

> I really don't see how this is helping consumers at all,
> BFL has been delivering and providing refunds.  It may
> have been slow, but it was happening and NOW it's not
> thanks to the FTC.  And on top of it, we might not even
> get our full refunds anymore if the FTC manages to
> spend enough of it on their own expenses before giving
> whats left back to the consumers.
>
> ***
>
> My 65nm orders took awhile to get last year, but they
> delivered them and I had recovered my costs within a
> couple months and made a lot of profit afterwards.

(*Id*. at 240).

On September 28, 2014, to protect the interests of Consumers and the putative class, Consumers moved on an emergency basis to intervene in the FTC action under Rule 24.  (Appendix, 100-120).  In the course of pursuing the motion to intervene, Consumers' counsel contacted the parties in the FTC action to ascertain their position on Consumers' intervention. (*Id*. at 115). The FTC was the only party who objected, specifically asserting intervention by Consumers is inappropriate because "this is a statutory enforcement action[.]"  (*Id*. at. 203).

11

On September 30, 2014, the TRO entered by Judge Wimes was extended to October 3, 2014. (Appendix, 207). During briefing of and prior to a hearing on Consumers' motion to intervene, the FTC and BFL sought and obtained, without providing notice to Consumers or an opportunity to object, entry of an "agreed and stipulated order." (Appendix, 259-292). The Stipulated Interim Order requires that all bitcoins held by BFL be transferred to a "Court-controlled bitcoin wallet[.]" (*Id*. at 274). The Stipulated Interim Order requires the Temporary Receiver to "[l]iquidate any and all assets owned by or for the benefit of the Receivership Defendant that the Temporary Receiver deems to be advisable or necessary" and to "begin establishing an adequate cash reserve to cover potential refund liability." (*Id*. at 271, 275). Further, in order to establish an adequate cash reserve to cover potential refund liability, the Stipulation Interim Order requires the Temporary Receiver to immediately begin converting "[BFL's] substantial bitcoin holdings to cash on a systemic and reasoned basis" and to liquidate "obsolete inventory and unnecessary property." (*Id*.).

The Stipulated Interim Order also requires the Temporary Receiver to develop a "Business Plan," which will be considered by the district court as part of the preliminary injunction hearing to determine whether there is a reasonable assurance of BFL's success and financial stability and whether both consumers and creditors are adequately protected. (Appendix, 276-277). In considering whether

12

the "Business Plan" is feasible, "[a]ny proposed refund policy and fairness of the same to customers" is one of five factors the district court will consider. (*Id*. at 277).

On October 3, 2014, Judge Wimes conducted a teleconference hearing on Consumers' motion to intervene. (Appendix, 293-322). At the beginning of the hearing, Judge Wimes asked Consumers' counsel, "Why is it do you think you should intervene at this time?" (*Id*. at 295). In response, in pertinent part, Consumers' counsel argued:

> I think the reason that we're doing it right now and it's so important, just one thing off the top of my head that stands out is the interim order that was stipulated to by the parties and filed last night and signed by the court[.] I think it's just one little fact that demonstrates that. I flipped through that order for the first time last night because it was the first time I'd seen it. This order was negotiated in secret between the FTC and between the defendants without any input from the class. (Appendix, 295-296).

*** 

13

It's not really that we're complaining that we're not going to get the money, but we're losing out on our chose in action, you know, the personal property of the right to bring that case. (Appendix, 297).

\*\*\*

Right now what we're talking about, and I think this is demonstrated by the order the court entered yesterday, is that equitable remedies, the constructive trust the class was asking for over in Kansas. That was asking the Kansas court to take control of the personal property that the defendants had that belonged to the class member[s], and what that is are the Bitcoins. And Bitcoin is personal property the class members had paid to the defendants, the mining machines that the customers had already paid for. We took the position from the District of Kansas action that the machines that were sitting over there on the defendant's premises in fact belonged to the members of the class because they had already paid for them. (Appendix, 297-298).

\*\*\*

14

But what I'd like to do is when the court is going to enter orders like the one the court did yesterday that contains provisions that might be concerning to the class, I'd like to be able to stand up and say, Judge, I've gotten telephone calls from customers and they're concerned about this provision. They're worried that some of them want Bitcoins back and not necessarily cash and the receiver might be able under this order to just sell the personal property for cash, which isn't what they're looking for. And really I think that's the type of input the court wants to hear. (Appendix, 299).

\*\*\*

I think there's a purpose to be served here by the class representatives. I mean, that's the reason they exist is to give the court one place to look when it needs input as to what the customers think. And right now nobody's giving that viewpoint. (Appendix 302).

\*\*\*

I think the fact that both the Federal Trade Commission and [defendants] are both here telling the court that my

15

interests are not property, that Bitcoin is not personal property, and that my claims are speculative and not concrete demonstrate the fact that there's nobody here protecting the interest of the class members. (*Id*. at 319).

A few hours after the hearing, Judge Wimes denied Consumers' motion to intervene. (Appendix, 323-326). In the order, Judge Wimes concluded the FTC is presumed to adequately protect the interests of Consumers and the putative class. (*Id*. at 325). Judge Wimes additionally found "Alexander and Symington's concerns too remote at this stage of the proceedings to justify intervention" but indicated intervention may be appropriate "[a]s the case progress and issues become more concrete[.]" (*Id*. at 326). Consumers filed a notice of appeal that same day. (*Id*. at 327).

Appellate Case: 14-3286    Page: 23    Date Filed: 11/25/2014 Entry ID: 4219473

## SUMMARY OF THE ARGUMENT

This Court should reverse Judge Wimes' order denying Consumers' motion to intervene under Rule 24 because Judge Wimes did not accept as true all material allegations in the motion to intervene, did not construe the motion in favor of Consumers, and applied the wrong legal standards in evaluating Consumers' claimed interests and whether such interests would be adequately represented.

Consumers, on behalf of a putative class, filed a class action against BFL in the District of Kansas seeking to obtain possession of Bitcoin mining equipment class members have paid for in full, to obtain possession of bitcoins class members transferred to BFL in exchange for mining equipment, to obtain possession of bitcoins BFL "mined" using class members' mining equipment, and to obtain compensatory and punitive damages, costs of suit, and attorney's fees. The class action was already beyond the motion to dismiss stage, significant discovery had been undertaken, and the parties were making progress toward a class-wide settlement that would give class members what they want—*i.e.*, the option of obtaining mining equipment, bitcoins, cash, and/or other non-cash benefits.

Nearly six months after the class action was filed, the FTC sought and obtained an *ex parte* order dispossessing BFL of the Bitcoin mining equipment, the bitcoins, and other non-cash assets the class members seek to recover from BFL. Such property, primarily located in the District of Kansas, has been transferred to a

17

temporary receiver appointed by Judge Wimes in the Western District of Missouri. Even though Judge Wimes acknowledged the Bitcoin mining equipment and bitcoins currently possessed by the Temporary Receiver "could be consumers' personal property," and even though Judge Wimes admitted "[w]e don't even have our hands around this . . . [t]he receiver's trying to wrap its hands around all of this," Judge Wimes nevertheless has already ordered the immediate sale of such personal property. (Appendix, 271, 275, 298-299).

Specifically, Judge Wimes ordered the Temporary Receiver to immediately begin converting "[BFL's] substantial bitcoin holdings to cash on a systemic and reasoned basis" in order to establish "an adequate cash reserve to cover potential refund liability." (Appendix, 275). Judge Wimes has also authorized the Temporary Receiver to liquidate class members' Bitcoin mining equipment as "obsolete inventory and unnecessary property" in order to create an adequate cash reserve to cover potential refund liability. (*Id*. at 271, 275).

Liquidating the bitcoins and Bitcoin mining equipment currently possessed by the Temporary Receiver in order to provide cash refunds to class members, however, deprives class members of their legal rights and fails to adequately address class members' concerns. For example, in the class action, class members may recover the Bitcoin mining equipment they purchased, bitcoins, compensatory damages, consequential damages, punitive damages, costs of suit, and attorney's

fees.  Further, BFL was finally starting to ship mining equipment shortly before the FTC action was filed.  But for the untimely FTC action and Judge Wimes' order halting BFL from shipping, Kyle Alexander likely would have already received the mining equipment he paid for in full—and Kyle Alexander could have recovered the $308.00 he paid to BFL simply by mining a single bitcoin.  (*Id*. at 123, 126).

Dylan Symington received his mining equipment several months late and, therefore, a cash refund wholly fails to adequately address his concerns.  Dylan Symington also seeks to recover bitcoins BFL mined for its own benefit using his equipment and bitcoins he could have mined had the equipment been delivered timely.  A cash refund to Dylan Symington fails to adequately address his concerns and, regardless, this would raise additional legal dilemmas, such as: (1) whether the FTC and/or Judge Wimes may force a consumer to accept one remedy when other remedies are available; and (2) whether a consumer (having already received Bitcoin mining equipment) who is forced to receive a cash refund via the FTC action must incur the expense of shipping the equipment back to BFL and/or the Temporary Receiver.

The court-ordered sale of bitcoins and Bitcoin mining equipment purchased by class members will automatically foreclose class members' ability to recover such property (by settlement, through trial, or otherwise) and deprives class members of their property rights.  Further, forcing class members to accept a cash

19

refund in lieu of receiving Bitcoin mining equipment (*i.e.*, equipment BFL has a contractual duty to deliver and class members have a contractual right to receive) deprives class members of their contractual rights. Depriving class members of their property and contractual right to possession of personal property held by the Temporary Receiver, without at least letting them have a voice in the matter, violates due process of law.

The FTC also seeks to rescind class members' contracts with BFL. (Appendix, 30). Not only will the court-ordered liquidation foreclose class members' ability to recover bitcoins and Bitcoin mining equipment, the rescission of class members' contracts will nullify warranties for equipment already delivered and will extinguish class members' ability to recover damages in the class action. Under Kansas law, a plaintiff may not both rescind a contract and recover damages related to that contract but, rather, the plaintiff must elect one remedy or the other. *See e.g., Lehigh, Inc. v. Stevens*, 468 P.2d 177, 182 (Kan. 1970) (rescission of a contract is a remedy that excludes the recovery of damages). If the FTC and/or Judge Wimes rescinds class members' contracts as requested in the FTC's complaint, an election of remedies will have been made without class members' input or choice. Consumers, on behalf of the putative class, should at least be able to have a say in the matter.

Appellate Case: 14-3286     Page: 27     Date Filed: 11/25/2014 Entry ID: 4219473

Although the FTC seeks rescission of contracts as alleged in its complaint, the FTC opposed intervention on the grounds it might or might not actually seek or obtain rescission of contracts, so Consumers might or might not be impaired. (Appendix, 212-213, 219, 304). The FTC's argument, however, is contrary to the express language of Rule 24. *See* Fed. R. Civ. P. Rule 24(a)(2); *see also Curry v. Regents of Univ. of Minnesota*, 167 F.3d 420, 422 (8th Cir. 1999) (intervention appropriate where interests "*might* be impaired by the disposition of the case") (emphasis added).

The FTC's tactics also constitute improper gamesmanship. *See National Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 973-974 (8th Cir. 2014) ("Allowing litigants to defeat a motion to intervene by expanding or constricting the scope of a lawsuit through allegations at a motion hearing or arguments in a brief would promote gamesmanship and create uncertainty for prospective intervenors."). It was error for Judge Wimes to conclude Consumers' interests are "too remote" because the FTC, in the course of ongoing proceedings, might or might not abandon seeking the relief it originally requested.

Judge Wimes also erroneously concluded the FTC is entitled to a presumption it will adequately represent Consumers' interests. As noted by Judge Wimes, in cases involving "a government entity that represents interests common to the public . . . courts presume the government entity adequately represents *the*

21

*public*[.]" (Appendix, 324) (emphasis added). Here, although Consumers and the public at large share some common interests, such as the prevention of future deception and harm to the public, Consumers have specific interests at stake that the public at large does not have. Unlike the public at large, Consumers and the putative class (*i.e.*, people who have paid money and/or transferred bitcoins to BFL on a pre-order basis) have property interests, contractual interests, and financial interests at stake. The FTC has admitted the interests of Consumers (and the putative class) are different than the interests of the "broader pool of victims" – the public at large – and the FTC only seeks to represent the interests of the "broader pool of victims." (*Id*. at 303). As such, it was error for Judge Wimes to presume the FTC will adequately represent Consumers' particular interests.

Even if the presumption was applicable, which is denied, any presumption the FTC will adequately represent Consumers' interests was overwhelmingly rebutted. For example, the FTC has already argued on the record Consumers have not suffered any damages unique from the public at large and Consumers' particular interests are "speculative." (Appendix, 212-213). The FTC has agreed on the record with BFL—*the alleged wrongdoer*—that class members have no colorable property, contractual, or other rights entitling them to possession of the bitcoins or Bitcoin mining equipment paid for in full by class members. (*Id*. at

22

303-304, 312-313).[1]  Further, the FTC stipulated to an interim order that requires and/or authorizes the immediate liquidation of class members' bitcoins and Bitcoin mining equipment in order to provide cash refunds—a remedy that forecloses class members' ability to obtain possession of the bitcoins and Bitcoin mining equipment they have paid for in full.

Judge Wimes' indication that intervention may be appropriate "[a]s the case progresses and issues become more concrete" illustrates the legal error that pervaded Judge Wimes' analysis.  Rather than focusing on whether the FTC action might or might not impair Consumers' interests depending on how the case progresses and issues become more concrete, Judge Wimes should have simply accepted Consumers' allegations as true, construed the motion to intervene in favor of Consumers, and assessed Consumers' interests under the assumption the FTC will receive all of the relief it seeks as alleged in the FTC's complaint (Doc. 2), certificate of counsel (Doc. 5), and motion, suggestions, and reply in support of

---

[1]      At Appendix 303, lines 24-25, and Appendix 304, line 1, the transcript of the FTC's argument should read as follows:  "So it's *not* established that selling Bitcoins on the open market results in a violation of the class' property rights."  (emphasis added).

Appellate Case: 14-3286      Page: 30      Date Filed: 11/25/2014 Entry ID: 4219473

temporary restraining order and preliminary injunction (Docs. 7-8, and 42).[2] (Appendix, 19, 22).  Judge Wimes' order denying intervention was in error and should be reversed.

---

[2]     Docs. 7-8 remained sealed by Judge Wimes until November 6, 2014. (Appendix, 22).

Appellate Case: 14-3286    Page: 31    Date Filed: 11/25/2014 Entry ID: 4219473

## ARGUMENT

### I. STANDARD OF REVIEW

"A court ruling on a motion to intervene must accept as true all material allegations in the motion to intervene and must construe the motion in favor of the prospective intervenor." *National Parks Conservation Ass'n*, 759 F.3d at 973. "This standard is identical to the standard applied to a typical motion to dismiss for lack of jurisdiction." *Id.*, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "When the allegations in the underlying controversy are relevant—for instance when a lawsuit ultimately targets the prospective intervenor's interests or rights—the court should focus its attention on the pleadings because "standing is to be determined as of the commencement of suit." *Id.*, quoting *Lujan*, 504 U.S. at 570 n. 5. "Viewing the complaint holistically, the court should assume the plaintiff will receive the relief it seeks and, from that assumption, assess the sufficiency of the prospective intervenor's motion." *Id*. A district court's standing and intervention determinations are reviewed de novo. *Id*. at 974.

### II. ARTICLE III STANDING IS NOT GENUINELY DISPUTED

"In the Eighth Circuit, a prospective intervenor must 'establish Article III standing in addition to the requirements of Rule 24.'" *National Parks Conservation Ass'n*, 759 F.3d at 974, quoting *U.S. v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833 (8th Cir. 2009). "The requirements for Article III standing are

25

(1) injury, (2) causation, and (3) redressability." *Id*. First, the prospective intervenor 'must clearly allege facts showing an injury in fact, which is an injury to a legally protected interest that is 'concrete, particularized, and either actual or imminent.'" *Metro. St. Louis Sewer Dist.*, 569 F.3d at 834, quoting *Curry*, 167 F.3d at 422. Second, the intervenor's alleged injury must be "fairly traceable to the defendant's conduct." *Id*. And, third, the prospective intervenor must establish that a "favorable decision will likely redress the injury." *Id*. "It is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009).

A.    <u>Consumers have alleged several actual or imminent injuries</u>.

Consumers, on behalf of a putative class, allege they were wrongfully induced into a contractual agreement under which class members agreed to pay money and/or to transfer possession of bitcoins to BFL in exchange for BFL's promise to manufacture and deliver Bitcoin mining equipment. Consumers allege BFL manufactured the Bitcoin mining equipment but, instead of delivering the equipment to class members, BFL converted the equipment and unjustly enriched itself by using class members' equipment to mine bitcoins for BFL's benefit. Consumers seek to recover the money class members paid to BFL and to regain possession of the bitcoins class members transferred to BFL. Consumers seek to

26

obtain possession of the paid-in-full Bitcoin mining equipment manufactured by BFL but not delivered to class members. Consumers seek to obtain possession of the bitcoins BFL mined for its own unjust enrichment using class members' mining equipment. Consumers also seek monetary damages from BFL.

The FTC action seeks to rescind class members' contracts with BFL, which will eliminate class members' contractual right to obtain possession of the Bitcoin mining equipment for which class members have paid in full and will extinguish class members' ability to recover damages under Kansas law. *See e.g., Lehigh, Inc.*, 468 P.2d at 182 (rescission of a contract is a remedy that excludes the recovery of damages). The FTC action seeks to place the bitcoins and Bitcoin mining equipment at issue in the possession of a receiver, and the Temporary Receiver has in fact obtained possession of such bitcoins and Bitcoin mining equipment. The FTC action seeks to liquidate the bitcoins and Bitcoin mining equipment class members seek to recover, and the Western District of Missouri has in fact ordered and authorized the immediate liquidation of such bitcoins and Bitcoin mining equipment in order to provide class members with cash refunds. Because the FTC cannot even guarantee class members would even receive a full refund, the FTC action risks forcing class members to incur a direct financial loss—on top of the loss of property and contractual rights.

Appellate Case: 14-3286     Page: 34     Date Filed: 11/25/2014 Entry ID: 4219473

To the detriment of class members, the FTC action also seeks to halt and/or delay BFL's shipment of Bitcoin mining equipment, and the Western District of Missouri has already ordered an "asset freeze" preventing BFL from shipping Bitcoin mining equipment. Halting and/or delaying shipping of Bitcoin mining equipment causes direct financial harm to class members by both denying class members' use and benefit of equipment they have already paid for in full (*i.e.*, class members cannot mine bitcoins) as well as by reducing class members' ability to mine for bitcoins in the future (because the overall mining difficulty required to generate future bitcoins will have greatly increased by the time class members receive Bitcoin mining equipment). To class members' detriment, the FTC action further delays and might, as a practical matter, prevent BFL from performing its contract obligation to provide Bitcoin mining equipment to class members.

There is no genuine dispute Consumers' alleged deprivation of property and contractual rights satisfies the "actual or imminent" injury in fact requirement. *See e.g., Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 1001 (8th Cir. 1993) (landowners allowed to intervene in a government action that might result in allowing others to use landowners' property and to extract natural resources therefrom, which might affect the value of from landowners' property); *U.S. v. White Plume*, 447 F.3d 1067, 1074-1075 (8th Cir. 2006) (injury in fact

28

requirement was established when companies alleged they sustained injury by not receiving the products for which they contracted). Consumers' alleged risk of financial harm also satisfies the actual or imminent injury in fact requirement. *See National Parks Conservation Ass'n*, 759 F.3d at 976 ("Risk of direct financial harm establishes injury in fact.").

B.  <u>Consumers' alleged injuries are directly traceable to the FTC action</u>.

Consumers can trace their alleged injuries to the FTC action through actual court orders already entered by Judge Wimes in the FTC action and the "would-be court order" if the FTC obtains the relief it seeks. *See id*. at 975 ("NSP can trace its injury to the EPA through the would-be court order if the Environmental Groups obtain relief.").

C.  <u>Consumers' alleged injuries can be redressed</u>.

If intervention is allowed and Consumers prevail in the FTC action, Consumers will avoid and/or delay class members' contracts being rescinded, Consumers will preserve class members' ability to seek damages in the class action or in an individual action, Consumers will avoid and/or delay the liquidation of bitcoins and Bitcoin mining equipment class members have paid for in full and seek to recover, and Consumers will ensure class members are not deprived of property and contractual rights against their will. *See id*. ("NSP's injury can be redressed. NSP seeks to prevent the Environmental Groups from

29

obtaining an order imposing BART on Sherco.  If NSP prevails, it avoids, or at least delays, the costly technology the Environmental Groups seek.").

III.    CONSUMERS ARE ENTITLED TO INTERVENE AS OF RIGHT UNDER RULE 24

Intervention is governed by Rule 24.  Fed. R. Civ. P. 24.  Rule 24 provides for intervention as of right as well as permissive intervention.  *Id*. at Rule 24(a)-(b).  On timely motion, a district court "*must permit* anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  *Id*. at Rule 24(a)(2) (emphasis added).  Intervention is to be construed liberally and doubts are resolved in favor of the proposed intervenor. *U.S. v. Union Electric Co*., 64 F.3d 1152, 1158 (8th Cir. 1995).

A.    Consumers' motion to intervene was timely.

The FTC action was filed under seal on September 15, 2014.  (Appendix, 23, 30).  Consumers' motion to intervene was filed on September 28, 2014.  (*Id*. at 19, 100).  There is no dispute Consumers' motion to intervene was timely filed.

30

B.   Consumers claim an interest in the exact property and exact transactions that are the subject of the FTC action.

Here, the property that is the subject of the FTC action is the money class members' paid to BFL, the bitcoins class members transferred to BFL, the Bitcoin mining equipment purchased by class members and manufactured by BFL, and the bitcoins BFL mined for its own unjust enrichment using class members' mining equipment.   The transactions that are the subject of the FTC action are class members' agreements to pay money and/or to transfer possession of bitcoins to BFL in exchange for BFL's promises to manufacture and deliver Bitcoin mining equipment.   Further, BFL's assets, which are held by the Temporary Receiver and subject to court-ordered liquidation, are the very assets that are available to satisfy Consumers' class action claims against BFL.   There is no question Consumers are claiming an interest relating to the exact property and exact transactions that are the subject of the FTC action.

C.   Disposition of the FTC action might impair and impede Consumers' ability to protect their interests and the interests of the putative class.

Rule 24 does not require an intervenor to show that actual impairment has already occurred; rather, the intervenor need only show his or her interests "may" be impaired.  *See* Fed. R. Civ. P. Rule 24(a)(2).  The phrase "may  . . . impair or impede," as used in Rule 24, means "might" impair or impede. *See Curry*, 167 F.3d

31

at 422 (intervention appropriate where interests "might be impaired by the disposition of the case[.]"); *see also Kansas Public Employees Retirement System v. Reimer & Koger Associates, Inc.*, 60 F.3d 1304, 1306-1308 (8th Cir. 1995). Here, because the FTC action seeks temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief, there is no question the FTC action might, as a practical matter, impair and impede Consumers' ability to protect their own interests (and the interests of the putative class) and satisfy their claims.

Although the FTC action and Consumers' class action are based on similar allegations, the remedies available in the FTC action are but a subset of (and in many respects might foreclose) the remedies available in Consumers' class action. For example, if the FTC obtains rescission of contracts, this will preclude Consumers' recovery of damages in the class action under Kansas law. *See e.g.*, *Lehigh, Inc.*, 468 P.2d at 182. Further, rescission of contracts by the FTC might void express, implied, or extended warranties on Bitcoin mining equipment class members have received from BFL and/or might require class members to incur the expense of shipping equipment back to BFL.

If the FTC obtains rescission as a settlement term (or any other undesirable remedy), the FTC might not allow class members the ability to opt out of the

Appellate Case: 14-3286    Page: 39    Date Filed: 11/25/2014 Entry ID: 4219473

settlement despite due process concerns, which the FTC has done on at least one other occasion.  (Appendix, 143) ("Potential Claimants will be bound by the mandatory settlement whether or not they make a claim.  Potential Claimants cannot opt out of the settlement and must submit a claim, if at all, through the process that this Notice describes.").  It is likely that many class members — if given the choice — would elect to seek consequential damages and punitive damages rather than rescission.  The FTC action, however, deprives class members of that choice and threatens to impede class members' due process rights by forcing them into an FTC-elected remedy without class members' input and without allowing class members to opt out of the remedy chosen by the FTC.

The FTC is not pursuing remedies for class members based on any comparative analysis between equitable or legal remedies, consent from class members, ethical obligations imposed by an attorney-client relationship with class members, or any legal malpractice standard of care.  Rather, the FTC is merely seeking equitable remedies because it has no authority to seek class members' actual damages.  For example, the FTC is unable to seek consequential damages, punitive damages, costs of suit, or attorney's fees for class members.  *See* 15 U.S.C. § 53(b). The FTC is only able to obtain equitable monetary relief, such as disgorgement or restitution.  *Id*. Although equitable remedies such as disgorgement or restitution may result in monetary recovery, each class member's maximum

33

recovery is limited to the purchase price actually paid by the class member. *See e.g., F.T.C. v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997) (the FTC may seek and obtain, through the court's equitable ancillary powers, the amount of the purchase price as monetary relief for consumers). In Consumers' class action, however, class members' maximum recovery is not limited to the purchase price.

Additionally, the court-ordered sale of bitcoins and Bitcoin mining equipment purchased by class members (stipulated to by the FTC) will delay and/or foreclose class members' ability to recover such property (by settlement, through trial, or otherwise). Further, the FTC's attempt to force class members to accept a cash refund in lieu of receiving Bitcoin mining equipment from BFL (*i.e.*, equipment BFL has a contractual duty to deliver and class members have a contractual right to receive) also deprives class members of their contractual rights. Depriving class members of their property and contractual right to possession of personal property held by the Temporary Receiver, without at least letting them have a voice in the matter, violates due process of law.

Further, if the FTC action results in disgorgement, restitution, or liquidation of BFL's assets, this will also impair, impede, and possibly even eliminate class members' ability to satisfy any judgment awarding compensatory damages, consequential damages, punitive damages, costs of suit, and attorney's fees under Kansas statutory and/or common law. *See SEC v. Flight Transp. Corp.*, 699 F.2d

34

943, 947-48 (8th Cir. 1983) ("Here, if the District Court orders [the defendant's] frozen assets 'disgorged' to defrauded investors, [intervenor] will be unable to obtain satisfaction of its claim. [Intervenor] has a sufficiently direct interest to support intervention."). In fact, the FTC has previously acknowledged that when it seeks equitable relief on behalf of the public, such equitable relief might impair or impede consumers' ability to obtain monetary damages. (Appendix, 159) ("The question of whether there are alternative plaintiffs that may seek or are seeking monetary relief is relevant in this context[.]").

   D.   Consumers' interests are not adequately represented by the FTC or
        BFL.

The intervenor need only satisfy the "minimal" burden of showing that the representation of the intervenor's interests by existing parties "may be inadequate." *Tribovich v. United Mine Workers of Am.*, 404 U.S. 528, 538, n. 19. (1972); *Turn Key Gaming, Inc. v. Miler & Schroeder Investments, Corp.*, 164 F.3d 1080, 1082 (8th Cir. 1999). Where a proposed intervenor has different incentives to pursue a claim than the existing parties, the proposed intervenor's interests are not adequately represented, and intervention should be allowed. *Turn Key Gaming, Inc.*, 164 F.3d at 1082. For instance, where an existing party's interest in settling a lawsuit may diverge substantially from the interests of proposed intervenors, the intervenors satisfy the minimal burden of showing the representation of their

35

interests by existing parties may be inadequate. *Mille Lacs Band of Chippewa Indians,* 989 F.2d at 1001.

The existing parties to the FTC action are the FTC, BFL, and individual owners/officers of BFL. (Appendix, 30). Because Consumers have filed a class action against BFL, BFL (and its owners and officers) are adverse to Consumers' interests and will not adequately represent Consumers' interests in the FTC action. The FTC does not contend BFL (or its owners or officers) will adequately represent Consumers' interests.

Further, the FTC does not argue it is willing or capable of actually representing Consumers' particular interests. *See Corby Recreation, Inc. v. General Elec. Co.*, 581 F.2d 175, 177 (8th Cir. 1978) (intervention was appropriate where exiting party "did not contend that it is willing or capable of representing [intervenor's] interest."). Instead, the FTC argues it (as a government agency representing the public at large) is entitled to a theoretical *presumption* it will adequately represent Consumers' particular interests. Such presumption, however, is inapplicable because Consumers' particular interests are distinguishable from the general interests of the public at large. In fact, the FTC has admitted the interests of Consumers (and the putative class) are different than the interests of the "broader pool of victims" – the public at large – and the FTC only seeks to represent the interests of the "broader pool of victims." (Appendix, 303).

36

Consumers do not seek to intervene on behalf of the public at large. Consumers seek to intervene on behalf of only themselves and those people who paid money and/or transferred bitcoins to BFL on a pre-order basis, who have interests distinct and separate from the public at large. Where, as here, the interests of the intervenor cannot be subsumed within the public interest, there is no presumption the government will adequately represent the intervenor's interests. *Curry*, 167 F. 3d at 423.

In *Chiglo*, this Court explained "the government only represents the citizen to the extent his interests coincide with the public interest . . . [i]f the citizen stands to gain or lose from the litigation in a way different from the public at large, the *parens patriae* would not be expected to represent him." *Chiglo v. City of Preston*, 104 F.3d 185, 187-188 (8th Cir. 1997) (emphasis in original). Here, Consumers stand to gain or lose in ways differently (*e.g.*, loss of personal property, loss of contract rights, loss of money, loss of causes of action) from the public at large and, therefore, there is no presumption the FTC will adequately represent class members' interests. *See e.g., Mille Lacs Band of Chippewa Indians*, 989 F.2d at 1001 (no presumption of adequate representation arose despite the fact the state was already a party to the suit and was representing the public in protecting the state's fish and game, because the landowners-intervenors would be affected by the litigation more severely than the public at large). In fact, the FTC would "shirk" its

Appellate Case: 14-3286    Page: 44    Date Filed: 11/25/2014 Entry ID: 4219473

duty to the public at large if it attempted to advance the narrower interests of Consumers and/or the putative class. *See National Parks Conservation Ass'n*, 759 F.3d at 977, quoting *Conservation Law Found. of New England, Inc., v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992). As such, it was error for Judge Wimes to presume the FTC will adequately represent Consumers' particular interests.

Even if the presumption cited by the FTC was applicable, which is denied, such presumption was overwhelmingly rebutted by the allegations and undisputed facts at issue. Here, the FTC seeks relief and has taken action contrary to Consumers' interests. The FTC has stipulated with BFL—Consumers' adversary— to relief contrary to Consumers' interests. The FTC has already stated on the record Consumers' particular interests are "speculative" and "not colorable." (Appendix, 213, 304). As such, it might be sanctionable misconduct if the FTC now attempts to advance interests it believes are speculative and not colorable. *See generally*, Fed. R. Civ. P. 11.

Contrary to Consumers' interests in obtaining possession of paid-in-full Bitcoin mining equipment manufactured by BFL, the FTC has delayed Consumers' receipt of such equipment by halting BFL from shipping equipment to class members. (Appendix, 54, 233, 235-237, 312). Contrary to Consumers' interests in obtaining possession of the bitcoins and Bitcoin mining equipment held by the Temporary Receiver, the FTC seeks to liquidate such property and, in fact, the FTC

38

has already stipulated to the liquidation of such bitcoins and Bitcoin mining equipment. (*Id*. at 259, 271, 275). Contrary to Consumers' interests in obtaining the benefit of their bargain, *i.e.*, the Bitcoin mining equipment for which they contracted and paid for in full, the FTC seeks to rescind such contracts. (*Id*. at 30). Contrary to Consumers' interests in preserving contract warranties on Bitcoin mining equipment already received from BFL, the FTC seeks to rescind such contracts. (*Id*.).

Because Consumers stand to gain or lose in ways differently from the public at large, there is no presumption the FTC will adequately represent Consumers' particular interests and it was error for Judge Wimes to presume so. Even if the presumption cited by the FTC was applicable, which is denied, such presumption is overwhelmingly rebutted by the allegations and undisputed facts at issue. As such, it was error for Judge Wimes to deny Consumers' motion to intervene.

Appellate Case: 14-3286    Page: 46    Date Filed: 11/25/2014 Entry ID: 4219473

## CONCLUSION

For the reasons set forth above, Judge Wimes' order denying Consumers' motion to intervene should be reversed.

Respectfully submitted,

WOOD LAW FIRM, LLC

By   /s/ *Noah K. Wood*

Noah K. Wood                    MO Bar #51249
noah@woodlaw.com
Ari N. Rodopoulos               MO Bar #58777
ari@woodlaw.com
1100 Main Street, Suite 1800
Kansas City, MO 64105-5171
T: (816) 256-3582
F: (816) 337-4243

Attorneys for Movants - Appellants

40

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

**Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [**X**]     this brief contains 9,340 words total, or 8,241 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

    [ ]     this brief uses a monospaced typeface and contains <state the number of> lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [**X**]     this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2011, version 14.3.9, in font size 14 and in type style Times New Roman, or

    [ ]     this brief has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: November 25, 2014         WOOD LAW FIRM, LLC

           By    /s/ *Noah K. Wood*
           Noah K. Wood         MO Bar #51249
           noah@woodlaw.com
           Ari N. Rodopoulos      MO Bar #58777
           ari@woodlaw.com
           1100 Main Street, Suite 1800
           Kansas City, MO 64105-5171
           T: (816) 256-3582
           F: (816) 337-4243

           Attorneys for Movants – Appellants